ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br><br>Apelados<br><br>v.<br><br>**ÓNIX RAMÓN BARRETO TORRES**<br><br>Apelante | KLAN202300508 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de **Aibonito**<br><br>Criminal Núm.: **C VI2020G0004 y otros**<br><br>Sobre: Art. 93 A CP (1er. grado) y otros |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y la Jueza Boria Vizcarrondo.

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de enero de 2025.

Comparece ante nos, mediante *Apelación,* Ónix Ramón Barreto Torres (Barreto Torres o Apelante) y nos solicita que revoquemos la *Sentencia* dictada el 19 de enero de 2023 por el Tribunal de Primera Instancia, Sala Superior de Arecibo (TPI). Mediante la misma, el TPI declaró a Barreto Torres culpable de la comisión de una serie de delitos y lo condenó a cumplir un total de doscientos treinta y siete (237) años de reclusión, sentencia que extingue desde aquella fecha.

Por los fundamentos que discutiremos a continuación, confirmamos la sentencia emitida por el TPI.

**I.**

Por hechos ocurridos el 28 de septiembre de 2019, se presentaron varias acusaciones en contra del aquí apelante. Luego de varios trámites procesales, el juicio en su fondo se celebró el 29 de agosto de 2022. Por parte del Ministerio Público testificaron el sargento Alberto Torres Ramírez, el agente Carlos J. Medina

Delgado, el agente Héctor J. Román Luciano, la señora Cruz A. Maldonado Orama, la doctora Edda Luz Rodríguez Morales, el señor Jesús Manuel Natal Alicea, la señora Mercedes Natal Alicea y el señor Tomás Junior Soto Natal. Concluido el desfile de prueba, el 19 de enero de 2023, Barreto Torres fue hallado culpable de los siguientes delitos:

1. Artículo 248 del Código Penal de Puerto Rico (Código Penal), Ley Núm. 146-2012, 33 LPRA sec.5338, (Uso de disfraz en la comisión de delito) por lo que fue sentenciado a tres (3) años de reclusión, concurrentes.

2. Artículo 158 (c) del Código Penal, *Íd.*, (Secuestro Agravado) por lo que fue sentenciado a cincuenta (50) años de reclusión, concurrentes.

3. Artículo 93 (a) del Código Penal, *Íd.*, (Asesinato en Primer Grado) por lo que fue sentenciado a noventa y nueve (99) años de reclusión, concurrentes.

4. Dos (2) infracciones al Artículo 5.04 de la Ley de Armas de Puerto Rico de 2000 (Ley de Armas), Ley Núm. 404-2000, 25 LPRA sec. 458 (c), (Portación y Uso de Armas de Fuego Sin Licencia), por lo que fue sentenciado a diez (10) años de reclusión, duplicadas en virtud del Artículo 7.03 de la Ley de Armas, *Íd.*, para un total de veinte (20) años, consecutivos.

5. Artículo 5.07 de la Ley de Armas, *Íd.*, (Posesión o Uso Ilegal de Armas Largas Semiautomáticas, Automáticas o Escopeta de Cañón Cortado), por lo que fue sentenciado a cuarenta y ocho (48) años de reclusión, consecutivos.

6. Cinco (5) infracciones al Artículo 5.15 de la Ley de Armas, *Íd.*, (Disparar o Apuntar Armas), por lo que fue sentenciado a veinticinco (25) años (5 años por cada infracción) de reclusión, duplicados en virtud del Artículo 7.03 de la Ley

de Armas, *Íd.*, para un total de cincuenta (50) años, consecutivos.

Para un cabal entendimiento de los hechos ocurridos, haremos un resumen de la prueba desfilada en el juicio.

Según la prueba desfilada durante el juicio, para el 28 de septiembre de 2019, el señor Tomás Junior Soto Natal (Tomás Soto Natal), hermano de la víctima, salió de su trabajo como guardia de seguridad a eso de las 4:45 am.[1] Esa mañana, se dirigió a su hogar en el Residencial Las Mesetas, localizado en el Municipio de Arecibo, Puerto Rico.[2] Al llegar a su hogar, estacionó su vehículo, un Mazda Protegé blanco del 1999, frente al Edificio #6, y se bajó del mismo.

Testificó que al bajarse de su vehículo, se le acercaron seis (6) individuos, tres (3) enmascarados y tres (3) no enmascarados.[3] De los enmascarados, pudo identificar al acusado, Ónix R. Barreto Torres, quien identificó en sala.[4] Aunque Barreto Torres estaba enmascarado, Tomás Soto Natal lo pudo identificar puesto que la careta que portaba el acusado no le ocultó la cara completamente. Testificó que pudo ver su pelo, frente, ojos, cejas y la mitad de la nariz.[5] Además, lo identificó por su voz, señalando que, aunque el acusado intentó modificar su tono de voz, lo conocía y la pudo reconocer. Esto debido a que la esposa de Tomás Soto Natal tenía una relación de parentesco con el hermano de la pareja del apelante, que lo había visto anteriormente en Las Mesetas y compartido con él en varias ocasiones.[6]

Los seis (6) individuos lo comenzaron a agredir y arrinconar. Le quitaron su teléfono y le dieron en la cara con el mismo, le halaron la camisa, lo empujaron y lo forzaron, a empujones, golpes

---

[1] Transcripción de Juicio por Jurado, 15 de septiembre de 2022, págs. 39-40.
[2] *Íd.*, pág. 41.
[3] *Íd.*, pág. 42.
[4] *Íd.*, pág. 49.
[5] *Íd.*, págs. 49-50.
[6] *Íd.*, pág. 51.

y amenazas, hacia un apartamento frente a la cancha de baloncesto del complejo de Las Mesetas.[7] Además, testificó que lo amenazaron con armas de fuego, incluyendo pistolas "Glock" y un rifle.[8] En todo momento, Tomás Soto Natal sintió miedo por su vida.[9]

Al llevarlo al apartamento frente a la cancha, los individuos le cuestionaron sobre el paradero de su hermano, Ian Joel Soto Natal y que de negarse a decirles, iban a matarlo.[10] Lo amenazaron con el rifle, poniéndoselo en la boca. Ante el miedo y estrés que tenía tuvo que revelar dónde se encontraba su hermano, aunque no pudo dar la dirección exacta. Ante ese hecho, los individuos lo forzaron a conducir su carro y llevarlos a la casa dónde estaba pernoctando su hermano Ian Joel Soto Natal.[11]

El grupo se dividió en dos carros, el carro de Tomás Soto Natal y otro vehículo, una guagua blanca que siguió a Tomás Soto Natal.[12] Con él se montaron dos de los individuos. Tomás Soto Natal los identificó ante la Policía como Miguel Bernardo Ocasio "Coby" y Noel Ramón Santiago e indicó que habían sido parte del grupo que lo secuestró al llegar a Las Mesetas.[13] Testificó que estando en el carro, Noel Ramón Santiago le apuntaba con un rifle.[14] En el otro vehículo, testificó que iban Mario Santos Zenón y el acusado Ónix Ramón Barreto Torres, así como otras dos (2) personas, todos ellos parte del grupo que lo había secuestrado en Las Mesetas.[15] Así las cosas, Tomás Soto Natal se dirigió hacia el barrio Víctor Rojas I en el municipio de Arecibo hasta llegar a la Calle Aragón, donde estaba la casa en la que vivía su abuela y estaba su hermano, Ian Joel Soto Natal.[16]

---

[7] *Íd.*, págs. 43-44.
[8] *Íd.*, pág. 44.
[9] *Íd.*, pág. 43.
[10] *Íd.*, págs. 44 y 51.
[11] *Íd.*
[12] *Íd.*, pág. 46.
[13] *Íd.*, págs. 45-46.
[14] *Íd.*, pág. 46.
[15] *Íd.*, págs. 47-50.
[16] *Íd.*, págs. 52-54.

Al llegar a la casa de su abuela, los dos vehículos se estacionaron uno detrás del otro. Miguel Bernardo Ocasio "Coby" le dijo a Tomás Soto Natal que le trajera a su hermano y que si no lo hacía, iba a matar a todas las personas que se encontraran dentro de la casa; entiéndase a la abuela, mamá, tía y tío de Tomás Soto Natal.[17] Así las cosas, Tomás Soto Natal fue a la puerta de entrada de la casa de su abuela y tocó la puerta y ventana, intentando levantar a su hermano.[18] Al poco tiempo, se levantó su hermano, Ian Joel Soto Natal, y le abrió la puerta.[19] Tomás Soto Natal le dijo que tenía que hablar con él y lo llevó hacia el portón de la casa, en dirección a la calle.[20] Testificó que en todo momento, se sentía asustado y con ansiedad y que también percibió miedo por parte de su hermano.[21]

Inmediatamente los hermanos Soto Natal llegaron hasta la calle, los individuos corrieron hacia ellos y los agarraron. Luego de un forcejeo, Tomás Soto Natal logró zafarse y correr para dentro de la casa.[22] Mientras corría hacia la casa, escuchó múltiples detonaciones y al virarse, testificó que vio a los seis (6) individuos, disparándole a su hermano.[23] Identificó a Miguel Bernardo Ocasio "Coby", Ónix Ramón Barreto Torres, Noel Ramón Santiago y Mario Santos Zenón como las personas que dispararon.[24] Además, testificó que estaban dos (2) otras personas, que no pudo identificar, presentes durante el asesinato.[25] Entró a su casa y rápido cerró la puerta, topándose ahí con su mamá, la señora Mercedes Natal Alicea (señora Natal Alicea).

---

[17] *Íd.*, pág. 54.
[18] *Íd.*, pág. 56.
[19] *Íd.*
[20] *Íd.*, págs. 56-57.
[21] *Íd.*, pág. 57.
[22] *Íd.*, pág. 58.
[23] *Íd.*, pág. 60.
[24] *Íd.*
[25] *Íd.*

El 19 de enero de 2023, el TPI dictó la sentencia en cada uno de los cargos.

Inconforme con la sentencia emitida, el Apelante compareció ante nos y solicitó que se revisara la determinación del TPI. Tras varios trámites procesales, el 4 de noviembre de 2024, presentó un *Alegato de Apelación* en el que señaló los siguientes errores:

> **ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL SENTENCIAR AL SEÑOR BARRETO POR EL DELITO DE ASESINATO EN PRIMER GRADO, BAJO EL CÓDIGO PENAL DE PUERTO RICO (2012), ARTÍCULO 93.A, HABIENDO EL JURADO ERRADO AL EMITIR UN VEREDICTO DE CULPABILIDAD CUANDO HUBO AUSENCIA DE PRUEBA SOBRE LA CONEXIÓN DEL ACUSADO Y SU PRESENCIA EN EL LUGAR DONDE OCURRIÓ EL ASESINATO.**

> **ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL SENTENCIAR AL SEÑOR BARRETO POR LOS DELITOS DE DISPARAR O APUNTAR ARMAS DE FUEGO CALIBRES 9 MM, .40 MM Y .223 MM, BAJO LA LEY 404, ARTÍCULO 5.15, HABIENDO EL JURADO ERRADO AL EMITIR UN VEREDICTO DE CULPABILIDAD CUANDO HUBO AUSENCIA DE PRUEBA SOBRE LA CONEXIÓN DEL ACUSADO Y SU PRESENCIA EN EL LUGAR DONDE OCURRIÓ EL ASESINATO.**

Con el beneficio del *Alegato* [*Del*] *Pueblo*, presentado el 7 de enero de 2025 y de la transcripción de la prueba oral, este Tribunal se encuentra en posición para resolver.

**II.**

**A.**

"[C]uando se cuestiona la suficiencia de la evidencia presentada en un juicio y se destaca – con miras a obtener la revocación de una convicción – que el foro primario erró en su apreciación y aquilatamiento de la prueba, 'el alcance de nuestra función revisora está limitado por consideraciones de extrema valía'. *Pueblo v. Negrón Ramírez*, 213 DPR \_\_\_, 2024 TSPR 41, en la pág. *8 (2024) (citando a *Pueblo v. Toro Martínez*, 200 DPR 834, 857 (2018)). Dicha limitación sobre nuestro rol revisor se debe a que los jueces de Instancia y los Jurados están en mejor posición que el

Tribunal de Apelaciones para apreciar y aquilatar la prueba presentada, así como sopesar los intereses encontrados al momento de admitir o suprimir prueba. L. Rivera Román, *La apreciación de prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones* en *Perspectivas en la práctica apelativa*, San Juan, Ediciones SITUM, 2018, pág. 106-108. En consecuencia, "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos". *Pueblo v. Arlequín Vélez,* 204 DPR 117, 146-147 (2020) (cita omitida).

Nuestro Tribunal Supremo ha reconocido que la deferencia debida al foro de instancia cobra mayor vigencia cuando trata de la apreciación de la prueba testifical. *Pueblo v. Negrón Ramírez, supra,* pág. *8. Esto debido a que, como foro apelativo, no estamos en posición para apreciar aquellos factores que inciden sobre la credibilidad de un testigo, como lo son los gestos, tonos de voz y el *demeanor* general del ofertante de la prueba.

> Es decir, los foros apelativos venimos obligados a prestar deferencia a las determinaciones de hechos y a la apreciación de la prueba que haga, ya sea un juez o un panel de jurados. Nada en nuestro ordenamiento nos impone, ni nos permite, proceder de manera distinta ante la revisión de un fallo o un veredicto de culpabilidad.
>
> *Íd.,* pág. *11.

Ahora bien, cuando existe una controversia sobre la suficiencia de la prueba, nuestro Tribunal Supremo ha resaltado que "[e]l análisis de suficiencia examina el contenido y la existencia de la evidencia, no su valor o peso, y en el proceso penal asegura que la prueba de cargo contenga al menos un mínimo de los requisitos imprescindibles para permitir que el caso pase a manos del Jurado". *Pueblo v. Colón Burgos,* 140 DPR 564, 578-579 (1996). Trata de los requisitos legales que deben estar presente para que el

Jurado pueda concluir que el delito se cometió; es un análisis estrictamente de Derecho.

> Estos requisitos son aquellos que establece el derecho para configurar el delito, aquellos sin los cuales no podría hallarse culpable a un acusado irrespectivamente de los méritos valorativos de la prueba presentada. El análisis de la suficiencia de la prueba, al contrario de la evaluación de la credibilidad, requiere poder identificar en la prueba aquellos elementos necesarios en derecho para poder concluir cuándo un juez que preside el proceso a interpretar el derecho penal, desde el punto de vista procesal y evidenciario, quien desempeña esta función debe dominar, o al menos estar instruido detalladamente, sobre los requisitos que el derecho exige para concluir que se ha violado la ley. El examen de la suficiencia de la prueba hace imprescindible la intervención preliminar del tribunal para determinar si el Jurado tendrá ante sí los elementos necesarios en derecho para poder llegar a un veredicto condenatorio, y en aquellos casos en que ya se ha rendido un veredicto con prueba insuficiente, su revocación.

*Íd.*, pág. 579.

"[C]omo norma general, los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza [el foro de instancia]". *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020). "Los tribunales revisores podremos sustituir el criterio que utilizó el foro primario por el nuestro **únicamente** cuando existen circunstancias extraordinarias en las que **se pruebe que el foro primario actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción o en error manifiesto o de derecho**". *Íd.* (Énfasis nuestro).

Un tribunal actúa con pasión, prejuicio o parcialidad cuando está "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 782 (2013). Para determinar si el tribunal de instancia actuó con pasión,

prejuicio o parcialidad, no estamos limitados a lo sucedido durante el juicio, sino podemos tomar en consideración conductas previas y posteriores a la determinación judicial. *Íd.*, pág. 788.

Para determinar si un tribunal incurrió en craso abuso de discreción, se deben considerar los siguientes criterios:

> [E]l juez no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; (2) el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en él, o (3) a pesar de tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez sopesa y los calibra livianamente.

*Pueblo v. Custodio Colón*, 192 DPR 567, 589 (2015).

"Por último, un juzgador incurre en error manifiesto que justifica la intervención del tribunal apelativo cuando 'la apreciación de [la] prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble'". *Pueblo v. Rivera Montalvo, supra*, pág. 374. (citando a *Pueblo v. Irizarry*, 156 DPR 780, 816 (2002)).

En resumen, nuestra función revisora ante un cuestionamiento de suficiencia de la prueba se limita a corroborar que la convicción esté sustentada por prueba suficiente y satisfactoria. La prueba debe establecer todos los elementos del delito y ser susceptible de ser creída por una persona razonable y de conciencia no prevenida. Como parte de este análisis, no nos corresponde entrar a dirimir la credibilidad de la prueba testifical desfilada, salvo que el juzgador haya incurrido en una apreciación apasionada, prejuiciada o parcializada, o que sus determinaciones sean manifiestamente erróneas.

**B.**

El delito de asesinato se encuentra tipificado en el Artículo 93 del Código Penal de Puerto Rico, *supra.* En particular, el Código Penal cataloga como asesinato en primer grado "**[t]odo asesinato**

perpetrado por medio de veneno, acecho o tortura, **o a propósito o con conocimiento**". *Íd.*, Artículo 93 (A). (Énfasis nuestro).

En cuanto a ese particular, la tratadista Dora Nevárez-Muñiz nos explica que:

> Es asesinato en primer grado toda muerte causada a propósito o con conocimiento; ya no será necesario probar el elemento de la premeditación (definido como la deliberación previa a la resolución de matar). Esto relaja los requisitos para probar el asesinato en primer grado, y hace más inteligible la instrucción que se imparta al jurado sobre el elemento mental.
>
> D. Nevárez-Muñiz, *Código Penal de Puerto Rico comentado*, 4ª ed. rev., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 155.

Los elementos del asesinato en primer grado en la modalidad de "a propósito o con conocimiento" están resumidos en el *Libro de Instrucciones al Jurado*, aprobado el 25 de marzo de 2022, 208 DPR 1042 (2022).[26] Dicho delito se comete cuando: (1) se da muerte a un ser humano, (2) a propósito o con conocimiento. *Íd.*, pág. 100. Continúa explicando que:

> "Dar muerte a un ser humano" significa que los actos o las omisiones de una persona ocasionaron la muerte a un ser humano y que la muerte no fue un resultado demasiado lejano o accidental, ni dependió demasiado de algún acto voluntario de otra persona.
>
> El propósito y el conocimiento son estados mentales.
>
> Una persona actúa "a propósito" cuando su objetivo consciente es causar la muerte a un ser humano. [**El tribunal podría ilustrar este elemento con el ejemplo siguiente**: cuando una persona le pone veneno a otra persona con el propósito de causarle la muerte].
>
> Una persona actúa "con conocimiento" cuando es consciente que la producción de la muerte es una consecuencia prácticamente segura de su conducta**.** [**El tribunal podría ilustrar este elemento con el ejemplo siguiente**: cuando se coloca una bomba en un avión con el propósito de que muera una persona, esa bomba estalla en el avión y mata no solo a la persona que se

---

[26] Entendemos que el *Libro de Instrucciones al Jurado* no constituye una fuente de derecho penal que supere la letra del artículo que establece un delito, y que su propósito es el de brindar orientación a la comunidad jurídica. En esta ocasión, se cita el referido texto puesto que resume lo que nuestro Tribunal Supremo ha determinado jurisprudencialmente con relación a los elementos del delito de "asesinato en primer grado" del Artículo 93 (A) del Código Penal.

quería matar sino también a otras personas que se encontraban en el avión en ese momento. Aunque la acción no iba dirigida voluntariamente a producir ese resultado, la ley considera que la persona mató con conocimiento a las demás personas].

*Íd.* (Énfasis en la original).

Para mayor claridad, los Artículos 22 (1) y (2) del Código Penal, *supra*, definen los estados mentales de "a propósito" y "con conocimiento". "[C]on relación a un resultado, una persona actúa 'a propósito' cuando su objetivo consciente es la producción de dicho resultado". *Íd.*, Artículo 22 (1) (a). "[C]on relación a un resultado, una persona actúa 'con conocimiento' cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta". *Íd.*, Artículo 22 (2) (a).

Por lo tanto, la conducta tipificada por el Artículo 93 (A) del Código Penal no es aquella muerte causada por mero accidente o que el autor del delito no haya razonablemente previsto. Trata de una muerte sobre la cual el autor tenía intención de causar o que razonablemente sabía que iba a ser un resultado inevitable de su conducta.

## C.

La Ley de Armas de 2000, *supra*, contiene una serie de delitos no contemplados de manera explícita en el Código Penal, *supra*. Entre los delitos establecidos en este estatuto especial, el Legislador determinó necesario tipificar como delito el apuntar o disparar un arma de fuego de manera contraria a la ley. El Artículo 5.15 de la Ley de Armas, *supra*, dispone que:

(A) Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado:

(1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o

(2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna. La pena de reclusión por la comisión de los delitos descritos en los incisos (1) y (2) anteriores, será por un término fijo de cinco (5) años.

*Íd.*

En su obra *Delitos Especiales en Puerto Rico*, el tratadista Abelardo Bermúdez Torres nos explica que la primera modalidad del delito consta en "disparar voluntariamente un arma en un sitio público o en cualquier otro sitio donde haya alguna persona que pueda sufrir daño, aunque no le cause daño a persona alguna". A. Bermúdez Torres, 1ª ed. rev., Puerto Rico, LexJuris de Puerto Rico, 2022, pág. 74. La segunda modalidad del Artículo 5.15 se configura "cuando una persona, intencionalmente, pero sin malicia, o sea, de forma temeraria –pero sin propósito ni conocimiento– apuntaba hacia alguna persona con un arma, aunque no le causara daño a persona alguna". *Íd.*

De manera más simplificada, el *Libro de Instrucciones al Jurado, supra*, analizando el Artículo 6.14 de la Ley de Armas del 2020, Ley Núm. 168-2019, 25 LPRA sec. 466m (Ley de Armas 2020), dispone que los elementos de la primera modalidad son: (1) voluntariamente, (2) disparar cualquier arma de fuego, (3) fuera de los lugares autorizados por la Ley de Armas. *Íd.*, pág. 390. Por otro lado, los elementos de la segunda modalidad son: (1) intencionalmente, (2) apuntar hacia alguna persona con un arma de fuego. *Íd.*

**D.**

Ahora bien, la responsabilidad penal recae sobre dos personas: los cooperadores y los autores del delito, sean estos personas naturales o jurídicas. Código Penal, *supra*, Artículo 43. Dicho de otra manera, no se le podrá imponer responsabilidad penal a persona que no cumpla con los requisitos para cada una de estas categorías.

El Artículo 45 del Código Penal define al "cooperador" como aquellas personas que, "con conocimiento, cooperan mediante actos u omisiones que **no contribuyen significativamente a la consumación del delito**". *Íd.*, Artículo 45. (Énfasis nuestro). "[L]a actividad del cooperador es secundaria o accesoria a la actividad del autor y sobre todo es una contribución 'no significativa', trivial, de poco valor". D. Nevárez-Muñiz, *op. cit.*, pág. 93. Son las personas que ayudan, pero no participan directamente en la planificación o ejecución del delito, ni tienen conocimiento pleno del mismo. *Pueblo v. Sustache Sustache*, 176 DPR 250 (2009).

El Código Penal, *supra*, distingue la figura del cooperador con aquella del autor o coautor. Según el Artículo 44, son autores del delito:

> (a) Los que toman parte directa en la comisión del delito.
>
> (b) Los que solicitan, fuerzan, provocan, instigan o inducen a otra persona a cometer el delito.
>
> (c) Los que se valen de una persona inimputable para cometer el delito.
>
> (d) Los que a propósito o con conocimiento cooperan con actos anteriores, simultáneos o posteriores a la consumación del hecho delictivo.
>
> (e) Los que se valen de una persona jurídica para cometer el delito.
>
> (f) Los que actúen en representación de otro o como miembro, director, agente o propietario de una persona jurídica, siempre que haya una ley que tipifique el delito y realicen la conducta delictiva aunque los elementos especiales que fundamentan el delito no concurran en él pero sí en el representado o en la persona jurídica.
>
> (g) Los que a propósito ayudan o fomentan a que otro lleve a cabo conducta que culmina en la producción de un resultado prohibido por ley, siempre que actúen con el estado mental requerido por el delito imputado con relación al resultado.
>
> *Íd.*, Artículo 44.

La mayor diferencia entre la figura del cooperador y la del autor es que el autor tiene un mayor grado de participación en la comisión del delito. Cuando varias personas participan como

coautores en la comisión de un delito, se les acusará por el mismo delito. *Pueblo v. Santiago*, 176 DPR 133, 145 (2009). En *Pueblo v. Aponte González,* 83 DPR 511 (1961), el Tribunal Supremo examinó la participación de varios coautores en la comisión de un robo. En aquel caso, se le imputó la comisión del delito a los cuatro (4) acusados, aunque quedó probado que únicamente dos (2) de los acusados utilizaron fuerza o violencia para despojar a la víctima de su propiedad. No obstante, el Tribunal resolvió que:

> Aun cuando se probó que fueron los otros dos coacusados [...] quienes intervinieron físicamente con la víctima, **no es menos cierto que el acto delictivo fue el resultado de un plan cuidadosamente urdido, mediante el cual los cuatro acusados, de común acuerdo y con singular audacia, atrajeron al perjudicado al lugar en donde fue asaltado**.
>
> *Íd.*, pág. 519. (Énfasis nuestro).

"La mera presencia durante la comisión de un delito no es suficiente por sí sola para sostener una convicción", *Íd.*, sino que es preciso "probar fuera de toda duda que la persona participó intencionalmente en la planificación del delito o realizó actos dirigidos a facilitar la ejecución del mismo". D. Nevárez-Muñiz, *op. cit.*, pág. 91. Su presencia "puede considerarse conjuntamente con las otras circunstancias que rodean el hecho delictivo a los fines de la determinación de responsabilidad". *Pueblo v. Aponte González, supra*, pág. 519. Véase, además, *Pueblo v. Ortiz Martínez*, 116 DPR 139 (1985); *Pueblo v. Lebrón Morales*, 115 DPR 113 (1984); *Pueblo v. Santos Ortiz*, 104 DPR 115 (1975).

"No es indispensable, pues, que el acusado ejecute personalmente el acto delictivo y basta con su presencia pasiva, siempre que su responsabilidad como co-autor pueda establecerse por actos anteriores, o como el resultado de una conspiración en que participó, o de un designio común". *Pueblo v. Aponte González, supra*, págs. 519-520. Así, la coautoría podrá probarse mediante prueba directa o prueba circunstancial que

demuestre su previo conocimiento, participación directa, dominio de hecho, aportación de un bien escaso u otro elemento para cumplir con el Artículo 44 del Código Penal, *supra*. *Pueblo v. Acaba Raíces*, 118 DPR 369 (1987).

## E.

Nuestro ordenamiento jurídico dispone que "[l]a juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedados establecidos o demostrados [...]". Regla 110 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 110. En este sentido, la Regla 110 (H) de Evidencia señala que:

> Cualquier hecho en controversia es susceptible de ser demostrado **mediante evidencia directa o mediante evidencia indirecta o circunstancial**. Evidencia directa es aquélla que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual por si, **o en unión a otros hechos ya establecidos**, puede razonablemente inferirse el hecho en controversia.

*Íd.*, Regla 110 (H). (Énfasis nuestro).

Conforme a la referida Regla de Evidencia, nuestro Tribunal Supremo ha determinado que la coautoría es un elemento susceptible de ser probado por cualquier prueba admisible, sea esta directa o indirecta. "El elemento de 'concierto y común acuerdo o designio común', como cualquier otro hecho en controversia, puede ser establecido mediante prueba indirecta o circunstancial, ya que **la evidencia circunstancial es intrínsecamente igual que la evidencia directa**". *Pueblo v. Pagán Santiago*, 130 DPR 470, 479 (1992). (Énfasis nuestro).

## III.

Discutido el Derecho aplicable, nos encontramos en posición para resolver las controversias señaladas por Barreto Torres en su

recurso apelativo. Por estar íntimamente relacionados, atenderemos los errores señalados en conjunto.

En síntesis, el Apelante alega que el TPI erró al aceptar el veredicto de culpabilidad emitido unánimemente por el Jurado en la acusación por Asesinato en Primer Grado (Artículo 93 (A) del Código Penal) y las acusaciones por Disparar o Apuntar un Arma de Fuego (Artículo 5.15 de la Ley de Armas de 2000). Fundamentó los errores en que la prueba presentada, particularmente el testimonio de Tomás Soto Natal, no logró establecer que el acusado tomó parte en el asesinato de Ian Joel Soto Natal. Al entender que su participación como coautor de los delitos cometidos el 28 de septiembre de 2019 se probó más allá de duda razonable, confirmamos la determinación del TPI. Veamos.

Como hemos señalado, el acusado Ónix Ramón Barreto Torres fue acusado de darle muerte a Ian Joel Soto Natal en común y mutuo acuerdo con cinco (5) otras personas, tres (3) de ellas identificadas como Noel Ramón Santiago, Miguel Bernardo Ocasio García (conocido como "Kobe" o "Coby") y Mario Santos Zenón. Según relató Tomás Soto Natal, los coacusados esperaron en el estacionamiento frente al Edificio 6 del Residencial Las Mesetas hasta que este llegara de su turno de trabajo a eso de las 5:20am. Quedó incontrovertido, que, en este momento, el acusado Barreto Torres estaba presente y participó activamente de agredir, asaltar y forzar a Tomás Soto Natal, en contra de su voluntad, a otro apartamento en el complejo de edificios de Las Mesetas. Del testimonio vertido por Tomás Soto Natal, y confirmado por los agentes de la Policía que lo entrevistaron ese mismo día, Barreto Torres le manifestó que estaban buscando a su hermano, Ian Joel Soto Natal, porque alegadamente había hecho ciertas cosas que no podían perdonar.[27]

---

[27] Transcripción, 15 de septiembre de 2022, *supra,* pág. 52.

Los hechos antes descritos demuestran que los coacusados actuaron en común y mutuo acuerdo. Estaban esperando a Tomás Soto Natal en el estacionamiento de su apartamento; lo asaltaron, agredieron, amenazaron y forzaron en contra de su voluntad a un apartamento para forzarlo a que les dijera dónde estaba su hermano Ian Joel; luego, lo forzaron a conducirlos a la casa de su abuela, donde se estaba quedando Ian Joel. La prueba demuestra que, aunque Miguel Ocasio García fue quien lideró el grupo, Barreto Torres participó activamente en el secuestro y asesinato.

Tomás Soto Natal también testificó que todos los que lo asaltaron estaban armados y que fue amenazado con armas. Por lo tanto, sintió miedo que le provocó a llevarlos a la casa de su abuela. Declaró que, en su carro, se montaron Noel Román Santiago y Miguel Ocasio García. Además, que en el otro carro se montaron Barreto Torres y Mario Santos Zeñon y lo siguieron hasta la Calle Aragón. Estando ahí, Tomás Soto Natal se bajó del carro y buscó a su hermano Ian Joel, llevándolo hasta la calle, donde el grupo de asaltantes lo agarraron. En el forcejeo, Tomás Soto Natal pudo escaparse y entrar a la casa de su abuela, cerrando la puerta detrás de él. A su vez, indicó haber escuchado varios disparos y que las cuatro (4) personas identificadas estuvieron presentes en frente a la casa de su abuela en ese momento.

El Jurado no contó únicamente con el testimonio de Tomás Soto Natal, sino que también tuvo la oportunidad de escuchar el testimonio de los agentes de la Policía que respondieron a las llamadas hechas al 911, investigaron la escena y entrevistaron a Tomás Soto Natal posteriormente en la comandancia de la Policía. Desde temprano en la investigación, Tomás Soto Natal reconoció e identificó a los acusados como los perpetradores de los delitos ocasionados en contra de él y de su hermano Ian Joel. Los agentes

de la Policía testificaron sobre la certeza y confianza del testimonio de Tomás Soto Natal en todo el proceso investigativo.[28]

Lo testificado por Tomás Soto Natal, así como la declaración de los agentes de la Policía, los familiares del occiso y la evidencia presentada constituyen la prueba directa y circunstancial necesaria para establecer que Barreto Torres es culpable del asesinato de Ian Joel Soto Natal más allá de toda duda razonable. La prueba estableció que Barreto Torres estuvo presente cuando asesinaron a Ian Joel Soto Natal y que tenía conocimiento de que este era el resultado intencionado por el grupo de coacusados que interceptaron a Tomás Soto Natal en la mañana del 28 de septiembre de 2019. La prueba ventilada demostró que Barreto Torres tenía conocimiento de lo que iba a suceder esa mañana y que el plan de los coacusados era ultimar a Ian Joel Soto Natal. La defensa de Barreto Torres no pudo presentar prueba de que él haya intentado desistir o impedir la consumación del plan, por lo que su rol como coautor quedó probado. En consecuencia, no existe defecto de suficiencia de prueba que permita que este Foro varíe las determinaciones realizadas por el Jurado.

Ahora bien, que el Apelante sostenga que el testimonio de Tomás Soto Natal adolezca de problemas de credibilidad es un asunto de apreciación de la prueba que le competió al Jurado. Como hemos señalado, "los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza [el foro de instancia]". *Pueblo v. Rivera Montalvo, supra,* pág. 373. "Los tribunales revisores podremos sustituir el criterio que utilizó el foro primario por el nuestro **únicamente** cuando existen circunstancias extraordinarias en las que **se pruebe que el foro primario actuó con pasión,**

---

[28] Transcripción de 31 de Agosto de 2022, *supra*, págs. 35 y 57-63.

**prejuicio o parcialidad, incurrió en craso abuso de discreción o en error manifiesto o de derecho**". *Íd.* (Énfasis nuestro).

> Es decir, los foros apelativos venimos obligados a prestar deferencia a las determinaciones de hechos y a la apreciación de la prueba que haga, ya sea un juez o un panel de jurados. Nada en nuestro ordenamiento nos impone, **ni nos permite**, proceder de manera distinta ante la revisión de un fallo o un veredicto de culpabilidad.
>
> Después de todo, el juzgador de hechos, ya sea un juez o un panel de jurados, es quien tiene el privilegio de oír la prueba testifical presentada ante sí y evaluar el comportamiento de los declarantes.
>
> *Pueblo v. Negrón Ramírez, supra*, en la pág. *11. (Énfasis nuestro).

Ante la ausencia de un indicio de abuso de discreción, prejuicio o parcialidad por parte del Jurado, le otorgamos deferencia a la apreciación de la prueba realizada. En consecuencia, no se cometieron los errores señalados y confirmamos la sentencia apelada.

**IV.**

Por los fundamentos discutidos, confirmamos la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones